Submitted on record and briefs November 5, reversed and remanded
December 26, 1985

## O. O., INC., dba
## Creswell Gravel Company,
*Appellant,*

*v.*

## CAPE MOUNTAIN ROCK PRODUCTS, INC. et al,
*Defendants,*

## CAPE MOUNTAIN QUARRIES & ROCK CRUSHING, INC.,
*Respondent.*

(16-81-07768; CA A37231)

712 P2d 159

Eric R.-T. Roost, Eugene, filed the briefs for appellant.

Michael J. Esler, Portland, filed the brief for respondent.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

The issue in this case is whether Oregon's mining lien statute, ORS 87.352, covers the labor and equipment furnished by plaintiff O.O., Inc., in a rock crushing operation within a quarry site.

ORS 87.352 provides, in pertinent part:

"(1) A person has a lien upon a mine or an improvement to secure payment for labor performed or materials furnished if that person:

"(a) Performs labor upon or furnishes provisions or materials for the development, *working or operation* of a mine, improvement or excavation;

"(b) Performs labor or furnishes materials in transporting materials or provisions for the use, working or development of a mine; or

"(c) Performs labor in transporting materials or the mine's product from a mine or improvement." (Emphasis supplied.)

We hold that the rock crushing constituted "working or operation of a mine" within the meaning of subsection (1)(a) of the statute because, by the terms of the agreements between the parties, the crushed rock was the primary product of the mine, and therefore crushing the extracted rock was essential to the contemplated operation. Accordingly, we reverse the trial court, which directed a verdict against plaintiff on the basis of its conclusion that "mining" did not include post-extraction work.

Defendant Cape Mountain Rock Products, Inc. (Rock Products), as lessee, agreed to extract, crush and stockpile a minimum quantity of rock from a quarry owned by defendant Cape Mountain Quarries & Rock Crushing, Inc. (Quarries). Plaintiff, which is a closely-held ·corporation whose general business is crushing and selling rock, contracted with Rock Products to crush the extracted rock at the quarry site.

Rock Products ultimately sold 49,982 cubic yards of rock from the quarry. 40,345 cubic yards, or 81 percent, was processed by plaintiff's rock crusher. The balance of the product extracted and sold consisted of topsoil and rock of irregular size, which was of less economic value than the

uniformly crushed rock. After Rock Products breached its agreements with Quarries and plaintiff, Quarries repossessed the site. Rock Products' failure to stockpile crushed rock, as required by the lease agreement, formed the basis for Quarries action. Plaintiff subsequently recorded a claim of lien and instituted this foreclosure action.

Oregon's mining lien statute has been construed and amended several times since it was first enacted in 1891. Judicial and legislative decisions indicate the meaning of the words "working or operation of a mine" in ORS 87.352(1)(a).

In *Williams v. Toledo Coal Co.*, 25 Or 426, 36 P 159 (1894), the Supreme Court was presented with its first opportunity to construe the 1891 act.[1] The plaintiff sought a miner's claim for working a wagon road leading to the defendant's mine. The court observed that the act provided for the following liens:

"* * * (1) To every person who shall do work or furnish materials for the working or development of any mine, etc.; (2) To every person who shall do work or furnish materials for the working or development of any such mine in searching for such materials or metals; and, (3) To all persons who shall work or furnish materials upon any shaft, tunnel, incline, adit, drift, or other excavation designed or used for the purpose of draining or working any such mine, lode, or deposit." 25 Or at 429-30.

The court then indicated that, because statutory liens are strictly construed, a claimant must

"* * * show that the labor was performed upon, or the materials were furnished for, the construction, repair, or improvement of that class of property which the statute has made liable or the payment thereof, in order to be entitled to its remedial advantages * * *." 25 Or at 431.

---

[1] The act provided, in pertinent part:

"That every person who shall do work or furnish materials for the working or development of any mine, lode, mining claim or deposit yielding metals or minerals of any kind, or for the working or development of any such mine, lode or deposit in search of such metals or minerals; and to all persons who shall do work or furnish materials upon any shaft, tunnel, incline, adit, drift or other excavation, designed or used for the purpose of draining or working any such mine, lode, or deposit, shall have a lien upon the same to secure to him the payment of the work or labor done or materials furnished by each respectively which shall attach in every case to such mine, lode and deposit, and though such shaft, tunnel, incline, adit, drift or other excavation, be not within the limits of such mine, lode or deposit."

Finally, the court concluded that "working or development of a mine" meant only extracting from or prospecting for it and therefore held that no lien could attach for the construction of wagon roads "however necessary they may be to the successful operation of a mine." 25 Or at 432.

That restricted construction of the mining lien statute probably would have precluded a claim of lien for plaintiff's rock crushing operation. However, in response to the *Williams* decision, the act was amended in 1899 so as to include work on tramways, roads, trails and millsites, or in boarding-houses, shops, assay offices or mills used for the working or development of a mine.[2] *Escott v. Crescent Coal & Nav. Co.*, 56 Or 190, 198, 106 P 452 (1910). Whether that amendment is interpreted as significantly expanding coverage of the 1891 act or merely as clarifying its proper construction, it indicates the legislature's intent to provide a broad scope of lienable activity, a scope properly determined by how directly and substantially an activity has contributed to a particular mining operation. Decisions subsequent to the 1899 act sustain this interpretation.[3]

---

[2] The emphasized provisions were added to the 1891 act:

"That every person who shall do work upon or furnish material for the working or development of any mine, lode, mining claim or deposit yielding metals or minerals of any kind, or for the working or development of any such mine, lode or deposit in search of any such metals or minerals; and any person who shall do work or furnish materials upon any shaft, tunnel, incline, adit, drift or other excavation, designed for the use of working or draining any such mine, lode, or deposit, *and any person who shall do work upon or furnish material for any tramway, road or trail used for the working or development of any such mine or mines or upon any mill site or mill used, owned or operated in connection with such mine or mines; and any person who shall perform work or labor or service on any road, tramway or trail or in any mill, boarding-house, shop, assay office or otherwise, in the working or operation of any such mine or mines; and any person who shall furnish any provisions or supplies for the working and development of any such mine, or running therewith,* shall have a lien upon the same to secure to him the payment for the work or labor done or materials furnished by each, respectively, which shall attach in every case to such mine, lode and deposit, *and to any road, tramway, mill, reduction works or other improvement owned in connection with and used in the operation and working of the same,* although such shaft, tunnel, incline, adit, drift or other excavation, mill or improvement be not within the limits of such mine, lode or deposit."

[3] The act was amended again in 1907 to eliminate most of the expansive language added in 1899 and replace it with the following emphasized provisions:

"Every person who shall perform labor upon, or furnish material for the working or development of any mine, lode, mining claim or deposit yielding or containing coal, metal or mineral of any kind, or for the working or development of

In *Grants Pass T. Co. v. Enterprise Min. Co.*, 58 Or 174, 113 P 859 (1911), the plaintiff sought to foreclose the mortgage of certain mining property executed by the defendant. Condor Water & Power Company claimed priority under the mining lien statute for the electricity furnished to a quartz mill at the defendant's mine. The court held that the labor and material supplied for the production of electricity at the mill were covered by the act. That holding presupposed that the quartz mill operation constituted working a mine. The holding was justified, because the supplying of electricity and the quartz mill were integral parts of the mining operation:

"* * * In quartz mining the crushing of rock containing mineral reduces the bulk by eliminating much of the superfluous matter, making it possible profitably to carry the resulting auriferous and argentiferous ores to market. By the use of suspended copper wires electricity can be transmitted from the place where it is generated to the mouth of a mine in

---

any such mine, lode, mining claim or deposit in search of any such coal, metal or mineral; and any person who shall do work or furnish materials for any shaft, tunnel, incline, adit, drift or other excavation designed for the use, or working, or draining of any such mine, lode, mining claim or deposit, and any person who shall do work upon or furnish material for any road, tramway, train [trail], *flume, ditch or pipe line, building, structure or superstructure* used for, or in connection with, the working or development of any such mine, lode, mining claim or deposit; and any person who shall perform labor or service in freighting or packing any material or supplies for the use, working or development of any such mine, lode, mining claim or deposit, road, tramway, trail, *flume, ditch or pipe line, building, structure or superstructure;* and any person who shall furnish any provisions, materials or supplies for the working or development of any such mine, mining claim or deposit, or the working or operation of any road, tramway, trail, *flume, ditch or pipe line, building, structure or superstructure* to secure to him the payment for the work or labor done, or material furnished, which lien shall attach in every case to such mine, lode, mining claim, deposit, road, tramway, trail, *flume, ditch or pipe line, building, structure or superstructure* owned or used in connection with the operation and development of the same."

The issue arises, therefore, whether it is significant that the references to working a mill or millsite were eliminated. This issue was resolved in *Washburn v. Inter-Mountain Mining Co.,* 56 Or 578, 585-86, 109 P 382 (1910), where the court stated that the language excised from the 1899 act and the language substituted in the 1907 act were essentially equivalent references to appurtenances connected with but not situated upon the mine site. The court further held that a mill situated upon a mine site was part of the realty, subject to a miner's lien without being specifically mentioned by the act. Even discounting the court's assumption that the on-site mill was a fixture, this holding necessarily assumes that an on-site milling operation constitutes "working a mine." Thus, the *Washburn* court indicated that the 1907 amendment was a change in form but not in substance and acknowledged the expansive scope of the act as amended. The 1907 act is substantively identical to ORS 87.352. *See* ORS 87.142(5) and (8).

almost inaccessible mountains and ravines, and there success-fully used to operate quartz mills. Mines which a few years ago were almost worthless have, by the employment of electricity, become very valuable, affording profitable employment to laborers and yielding rich returns to the owners. Electricity is capable of propelling machinery and of illuminating mine and mill by continuous operation, and as this modern agent is consumed by its use, so far as susceptible of discernment, and supplies a very urgent need tending to the proper working and development of a mine, it is believed that such force is a supply within the scope of that term and for the use of which a lien may fairly be implied from the statute." 58 Or at 177.

Thus, an activity's contribution to the proper work-ing and development of a mining operation was identified as an important factor for determining coverage of the mining lien statute. That approach was reaffirmed in *Bartels v. McCullough,* 102 Or 66, 73, 201 P 733 (1921), where the court held that cyaniding and assaying ore at the mine were lienable as "[b]oth required some physical labor as well as skill and both were necessary to the successful prosecution of the work of searching for and working the ore." In *Jackson v. Brown et al,* 116 Or 343, 348, 241 P 59 (1925), and *Heisler v. Hamilton Mammoth Mines Co.,* 110 Or 403, 406, 223 P 735 (1924), liens were allowed for work on roads integral to the working of mines.

Here, Rock Products' lease with Quarries required the crushing of rock after it was extracted. The primary product of the mine was intended to be crushed rock, and that product was essential to the mining operation. Accordingly, plaintiff's lien attached to the mine property. *See also Bishop v. Henry,* 84 Or 389, 165 P 237 (1917); *Loud v. Gold Ray Realty Co.,* 72 Or 155, 142 P 785 (1914).[4]

---

[4] Quarries urges us to construe Oregon's mining lien statute in accordance with the construction given Oklahoma's coal mining lien statute in *Riffe Petroleum Co. v. Great Nat. Corp., Inc.,* 614 P2d 576 (Okla 1980). There are two problems with defendant's argument. First, the critical language of the two statutes is entirely different. Although Oregon's statute identifies lienable activity as that involved in the "working or operation of a mine," Oklahoma's statute defines lienable activity as that involved in "developing and opening up coal mines" or working a mine "in and about" the premises. 614 P2d at 578. Thus, it is not instructive for purposes of this case that the *Riffe* court denied a lien for services involving the preparation of coal for marketing performed 14 miles from the mine site. Second, as was stated in *Jones v. Jones,* 270 Or 869, 874, 530 P2d 34 (1974):

"Although * * * statutes and cases [from other jurisdictions] are of interest, by

Reversed and remanded.

way of analogy, we are bound by what we believe to be the intent of the Oregon
legislature as shown by the terms used by it in enacting the [act in question] and
the subsequent amendments to that act * * *."